IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

DEREK GRIMM,

        Plaintiff,

   vs.                             Civil Action 2:13-cv-1257
                                       Judge Smith
                                       Magistrate Judge King

NORMAN FLEAGLE, III, *et al.*,

        Defendants.

<u>REPORT AND RECOMMENDATION</u>

This is a civil rights action under 42 U.S.C. § 1983 in which plaintiff, formerly incarcerated in the Chillicothe Correctional Institution ("CCI"), alleges that defendants Fleagle and Brown, with the assistance of other defendant(s), attacked plaintiff without provocation and that these and other defendants subjected plaintiff to abuse and unjustified force, issued false conduct charges and investigative reports and retaliated against plaintiff for having used the prison grievance procedure.  Plaintiff asserts claims of cruel and unusual punishment, deliberate indifference and conspiracy in contravention of the Eighth Amendment of the United States Constitution, and retaliation and conspiracy in contravention of the First Amendment.  This matter is before the Court on *First Motion for Summary Judgment of Defendants and the State of Ohio on Behalf of Norman Fleagle*, ECF 28 ("*Motion for Summary Judgment*").  For the reasons that follow, it is **RECOMMENDED** that the *Motion for Summary Judgment* be **DENIED**.

I.   **BACKGROUND**

When he was taken into custody by the Ohio Department of Rehabilitation and Correction ("ODRC") at the Correction Reception Center ("CRC"), plaintiff acknowledged receiving written and verbal instructions regarding the prison grievance process.  *See Exhibit A* (Inmate Orientation Checklist dated April 25, 2011, reflecting that plaintiff received "Verbal/Written Explanation of the Grievance System"), attached to *Defendants' and the State of Ohio's Reply in Support of Motion for Summary Judgment*, ECF 43 ("*Reply*").  *See also Exhibits B* and *C*, attached to *Reply* (Inmate Orientation Checklists dated May 10, 2011 and December 23, 2011); *Declaration of Corby Free*, ¶ 7 ("All inmates in the custody of ODRC are given both written and oral instructions on how to use the inmate grievance procedure including instructions on appeals to the Office of the Chief Inspector and direct grievance to that office as required by Ohio Admin. Code 5120-9-31(C)."), attached as *Exhibit E* to *Reply* ("*Free Declaration*").

In September 2011, plaintiff was transferred from Belmont Correctional Institution ("BeCI") to CCI where he was housed in Segregation Unit 2.  *Affidavit of Derek Grimm*, ¶¶ 3-4 ("*Plaintiff Affidavit*"), attached as *Exhibit 1* to *Plaintiff's Memorandum Contra to Defendants['] First Motion for Summary Judgment*, ECF 40 ("*Memo. Contra*").  On or around September 24, 2011, plaintiff submitted an informal complaint, contending that he had not received proper meals for two days.  *Id.* at ¶ 6.  *See also Informal Complaint Resolution*, attached as *Exhibit A* to *Plaintiff Affidavit*.  A staff member responded to this informal complaint on September 30, 2011.  *Id.*

At some point, plaintiff advised "correctional staff" that he had an allergy to onions. *Plaintiff Affidavit*, ¶ 8.  "The kitchen" accommodated this allergy by providing bagged meals to plaintiff in lieu of menu items that contained onions. *Id*.  On or around December 16 or 17, 2011, Correctional Officer Michael Clemmons delivered plaintiff a meal that contained onions. *Id*. at ¶ 9.  After plaintiff asked that Officer Clemmons or defendant Norman Fleagle, III, provide plaintiff with a meal that met his dietary restrictions, plaintiff received a bagged meal that contained trash and no food. *Id*. at ¶¶ 9–10.  Plaintiff spoke to an unidentified "supervisor" regarding this incident. *Id*. at ¶ 11.  On December 18, 2011, Officer Clemmons delivered a bagged dinner to plaintiff, advising that he had eaten plaintiff's muffin and had thrown away plaintiff's applesauce. *Id*. at ¶ 12.  On December 19, 2011, plaintiff filed an informal complaint regarding this incident. *Id*. at ¶ 13. *See also Informal Complaint Resolution*, attached as *Exhibit B* to *Plaintiff Affidavit*.  A staff member responded to this informal complaint on January 8, 2012. *Id*.

On December 28, 2011, defendant Fleagle worked on Segregation Unit 2 and allegedly harassed plaintiff during that shift. *Plaintiff Affidavit*, ¶ 14.  According to plaintiff, defendant Fleagle entered plaintiff's cell while plaintiff was asleep, slapped plaintiff's head, threw plaintiff's personal belongings, kicked plaintiff's mat, dared plaintiff to fight him and threatened plaintiff "with bodily harm and told [plaintiff that he] 'would pay for it' if [plaintiff] filed or made any more complaints." *Id*. at ¶¶ 14–15.

3

On December 29, 2011, plaintiff filed an informal complaint against defendant Fleagle and submitted it to defendant Lieutenant Craig Branham. *Id*. at ¶ 16. *See also Informal Complaint Resolution*, attached as *Exhibit C* to *Plaintiff Affidavit*. Thereafter, plaintiff met with defendant Branham to discuss this complaint. *Plaintiff Affidavit*, ¶ 17. During that meeting, plaintiff told defendant Branham that, in light of defendant Fleagle's threats and access to plaintiff's cell, plaintiff feared for his safety. *Id*. According to plaintiff, defendant Branham advised that a separation order would be issued, prohibiting the assignment of defendant Fleagle to Segregation Unit 2 and prohibiting that defendant from having any contact with plaintiff. *Id*. at ¶ 18.

On December 31, 2011, defendant Fleagle was assigned to work in plaintiff's unit. *Id*. at ¶ 21. Plaintiff became concerned for his safety and "repeatedly" asked defendant Corrections Officer Karl Brown for permission to speak with a "supervisor," which requests were denied by defendant Brown. *Id*. at ¶¶ 22-24. Hours later, defendant Fleagle approached plaintiff's cell and asked plaintiff whether he wanted to take a shower. *Id*. at ¶ 26. After plaintiff refused a shower, defendant Fleagle stepped closer to plaintiff's cell, asked plaintiff why he was spitting on defendant Fleagle (although plaintiff was not spitting on this defendant), grabbed mace and instructed plaintiff to come closer to the cell door. *Id*. at ¶ 27.

After defendant Fleagle had left the area, plaintiff began to complain of chest pains and asked to see a nurse. *Id*. at ¶¶ 28-29. Plaintiff was not actually experiencing chest pains, but he asked to

4

see the nurse an alternative method of seeking a supervisor's
assistance for protection from defendant Fleagle.  *Id*. at ¶ 30.
However, defendants Fleagle and Brown allegedly "ignored" plaintiff's
complaints of chest pain and defendant Fleagle advised the nurse that
plaintiff did not require medical attention.  *Id*. at ¶ 31.

Thereafter, defendant Fleagle placed Brandon Johns, the inmate in
the cell next to plaintiff's, in the shower.  *Id*. at ¶¶ 28, 32.
Defendant Fleagle returned to plaintiff's cell and asked plaintiff why
he requested a nurse.  *Id*. at ¶ 33.  When plaintiff responded that he
had experienced chest pains, defendant Fleagle asked plaintiff if he
remembered the informal complaint that plaintiff had written about
defendant Fleagle.  *Id*. at ¶¶ 33-34.  Plaintiff describes what
happened next:

> 36.  I was certain something was going to happen that
> night based upon Fleagle's initial comments about me
> "spitting on him", the fact he grabbed his mace during that
> exchange, his and Brown's refusal to allow me to speak with
> a supervisor or a nurse and the fact Fleagle previously
> threatened me not to file any more complaints and/or
> grievances.  So, I had a trash bag next to me to cover my
> face if Fleagle ended up spraying me with mace.
>
> 37.  After Fleagle heard my response, he took a step back
> and said, "I got your nurse", pulled out his mace and began
> to spray me while I was in my cell.
>
> 38.  Almost immediately after Fleagle was done spraying me
> with mace, the door to my cell opened.
>
> 39.  Once the door was open, Fleagle ran into my cell,
> slammed me on the bed and then slammed my head against the
> wall.  Fleagle then began to hit me in the face.
>
> 40.  Brown then entered my cell a short period after
> Fleagle and they both threw me to the ground and they both
> continued to assault me.
>
> 41.  While I was laying on the ground, Fleagle and Brown
> continued to hit and knee me in the face, side and back.

42.    Brown told me he needed my hand to cuff, and although
I complied with his instructions, Fleagle told me to stop
refusing and continued to assault me even after Brown had
one of my hands cuffed.

43.    Fleagle continued to assault me until Brown finally
told him to stop.

44.    Fleagle and Brown then removed me from my cell and
took me to the cage in front of the correctional officers'
desk at the end of the range.

45.    I then wrote a statement as to what happened.
(December 31, 2011, Inmate Use of Force Statement attached
hereto as "Exhibit D").

*Plaintiff Affidavit*, ¶¶ 36-45.  *See also Complaint*, ECF 1, ¶ 25

(alleging that defendants Fleagle and Brown "with the assistance of

Defendant [Correctional Officer Michael] Adams, attacked Plaintiff,

without provocation inflicting serious bodily injuries").  An hour

after this incident ("the December 31, 2011 incident"), plaintiff was

seen by a nurse.  *See Medical Exam Report*, attached as *Exhibit F* to

*Reply*.

On January 3, 2012, plaintiff submitted the following note

("kite") to the Ohio State Highway Patrol:  "I need to speak to you do

[sic] to a matter between me and a CO.  It's very important  thank

you."  *Exhibit E*, attached to *Plaintiff Affidavit* ("Plaintiff's

Kite").  *See also Plaintiff Affidavit*, ¶ 50.  In response, plaintiff

met with a Highway Patrol trooper on January 6, 2012.  *Id*. at ¶ 57.

During that meeting, plaintiff denied spitting on defendant Fleagle or

anyone else on December 31, 2011, and plaintiff "volunteered my DNA

because it would show my saliva was not on Fleagle's shirt."  *Id*. at ¶

58.

6

On January 5, 2012, defendant Branham provided a written response to plaintiff's December 29, 2011 informal complaint regarding the threats allegedly made by defendant Fleagle on December 28, 2011. *Exhibit C*, attached to *Plaintiff Affidavit*.  Defendant Branham advised that "[t]his matter will be looked into [illegible] on your claim of harrassment [sic] and threats."  *Id*.

On the same date, plaintiff filed an informal complaint against defendant Adams, complaining that this defendant "informed me not to send mail out during 2nd shift because it would get thrown away by the correctional officers."  *Id*. at ¶ 54.  *See also Informal Complaint Resolution*, attached thereto as *Exhibit F*.  A staff member responded to this informal complaint on February 7, 2012.  *Id*.

In early February 2012, plaintiff met with "someone from the prison about the assault [on December 31, 2011]."  *Plaintiff Affidavit*, ¶ 60.  *See also Use of Force* interview notes, attached thereto as *Exhibit G*.

In the middle of February 2012, plaintiff was transferred from CCI to the Southern Ohio Correctional Facility ("SOCF").  *Plaintiff Affidavit*, ¶ 61.  Months after this transfer, plaintiff met with a State Highway Patrol trooper and submitted his DNA to determine whether plaintiff had spat on defendant Fleagle's shirt.  *Id*. at ¶ 62. In the spring of 2013, plaintiff was transferred to the Ross County Jail to testify in a criminal trial charging defendant Fleagle with a felony.  *Id*. at ¶¶ 63-64.  Upon his arrival at the jail, plaintiff learned that his DNA was not found on defendant Fleagle's shirt and a "Prosecutor and Trooper" apologized to plaintiff "about what happened

7

on and leading up to the December 31, 2011 assault." *Id*. at ¶ 64.
Plaintiff later learned that defendant Fleagle had been convicted of a
"3rd degree felony in connection with the assault and his false
accusations against [plaintiff]." *Id*. at ¶ 65.

On December 20, 2013, plaintiff filed this civil rights action
under 42 U.S.C. § 1983, naming twelve individual defendants.
Defendants and the State of Ohio have moved for summary judgment on
plaintiffs' claims, which plaintiff has opposed. *See Memo. Contra*.
With the filing of the *Reply*, this matter is now ripe for resolution.

## II.  STANDARD

The standard for summary judgment is well established.  This
standard is found in Rule 56 of the Federal Rules of Civil Procedure,
which provides in pertinent part:

> The court shall grant summary judgment if the movant shows
> that there is no genuine dispute as to any material fact
> and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).  In making this determination, the evidence
must be viewed in the light most favorable to the non-moving party.
*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  Summary judgment
will not lie if the dispute about a material fact is genuine, "that
is, if the evidence is such that a reasonable jury could return a
verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986).  However, summary judgment is appropriate if the
opposing party fails to make a showing sufficient to establish the
existence of an element essential to that party's case and on which
that party will bear the burden of proof at trial. *Celotex Corp. v.
Catrett,* 477 U.S. 317, 322 (1986).  The mere existence of a scintilla

of evidence in support of the opposing party's position will be insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Anderson,* 477 U.S. at 251.

The party moving for summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Catrett,* 477 U.S. at 323. Once the moving party has met its initial burden, the burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 250 (quoting former Fed. R. Civ. P. 56(e)); *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir. 1995)("nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial"). "Once the burden of production has so shifted, the party opposing summary judgment cannot rest on the pleadings or merely reassert the previous allegations. It is not sufficient to 'simply show that there is some metaphysical doubt as to the material facts.'" *Glover v. Speedway Super Am. LLC*, 284 F. Supp.2d 858, 862 (S.D. Ohio 2003)(citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the non-moving party must support the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1).

In ruling on a motion for summary judgment "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Glover*, 284 F. Supp.2d at 862 (citing *InteRoyal Corp. v. Sponseller,*

889 F.2d 108, 111 (6th Cir. 1989)).  Instead, a "court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties."  *Id.  See also* Fed. R. Civ. P. 56(c)(3).

## III. DISCUSSION

Defendants argue that plaintiff's claims cannot proceed because he failed to exhaust his administrative remedies before filing this action.  The Prison Litigation Reform Act requires that a prisoner filing a claim under federal law relating to prison conditions must first exhaust available administrative remedies.  *Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001).  The statute provides, in pertinent part:

> No action shall be brought with respect to prison conditions under [section 1983 of this title], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

In order to satisfy this exhaustion requirement, an inmate plaintiff must "complete the administrative review process in accordance with the applicable procedural rules[.]" *Woodford v. Ngo*, 548 U.S. 81, 88 (2006).  "Failure to exhaust is an affirmative defense under the PLRA, and [] inmates are not required to specifically plead or demonstrate exhaustion in their complaints." *Jones v. Bock*, 549 U.S. 199, 216 (2007).  Exhaustion is not a jurisdictional predicate

10

but the requirement is nevertheless mandatory, *Wyatt v. Leonard*, 193 F.3d 876, 879 (6th Cir. 1999), even if proceeding through the administrative procedure would appear to the inmate to be "futile." *Hartsfield v. Vidor*, 199 F.3d 305, 308-10 (6th Cir. 1999).

Ohio has established a procedure for resolving inmate complaints. Ohio Admin. Code § 5120-9-31. The procedure is available to an inmate "regardless of any disciplinary status, or other administrative or legislative decision to which the inmate may be subject," O.A.C. § 5120-9-31(D), and is intended to "address inmate complaints related to any aspect of institutional life that directly and personally affects the grievant," including "complaints regarding policies, procedures, conditions of confinement. . . ." O.A.C. § 5120-9-31(A). Certain matters are not grievable, however, including "complaints unrelated to institutional life, such as legislative actions, policies and decisions of the adult parole authority, judicial proceedings and sentencing or complaints whose subject matter is exclusively within the jurisdiction of the courts or other agencies." O.A.C. § 5120-9-31(B).

Ohio employs a three-step grievance procedure. First, an inmate must file an informal complaint within fourteen days of the event giving rise to the complaint. O.A.C. § 5120-9-31(K)(1). The informal complaint must be filed "to the direct supervisor of the staff member, or department most directly responsible for the particular subject matter of the complaint." *Id.* If the informal complaint is resolved in a manner that is unsatisfactory to the inmate, he must file a notification of grievance with the inspector of institutional services

11

within fourteen days. O.A.C. § 5120-9-31(K)(2). If the inmate is dissatisfied with the disposition of the grievance, he must then appeal to the office of the chief inspector within fourteen days. O.A.C. § 5120-9-31(K)(3). "The decision of the chief inspector or designee is final." *Id*. Remedies for valid grievances include "changes to institutional policies or procedures, the implementation of new policies or procedures, and/or corrective action specific to the inmate's complaint." O.A.C. § 5120-9-31(L). Dismissal without prejudice of a civil rights complaint is appropriate if a prisoner fails to first exhaust administrative remedies. *See*, *e.g.*, *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005); *Crump v. Darling*, No. 03-2086, 2005 U.S. App. LEXIS 29546, at *3-4 (6th Cir. July 6, 2005).

However, the applicable law makes clear that a prisoner need exhaust only those administrative remedies that are "available" to that prisoner. *See*, *e.g.*, 42 U.S.C. § 1997e(a); *Napier v. Laurel County*, 636 F.3d 218, 222-23 (6th Cir. 2011). Whether a process is "available" under the PLRA frequently turns on whether a grievance procedure was available on its face even if the prisoner subjectively believes that the procedure would be futile. *Napier*, 636 F.3d at 224. Courts have found a grievance procedure "unavailable" when prison officials "have somehow thwarted" an inmate's attempts at exhaustion. *Brock v. Kenton County*, No. 02-5442, 93 Fed. Appx. 793, at *798 (6th Cir. Mar. 23, 2004). Nevertheless, the prisoner must still "make some affirmative efforts to comply with the administrative procedure" before a court will consider whether the procedure was unavailable. *Id*. *See also Napier*, 636 F.3d at 223 ("The Sixth Circuit requires

12

some affirmative efforts to comply with the administrative procedures before analyzing whether the facility rendered these remedies unavailable.") (internal quotation marks and citations omitted). Courts analyze "whether an inmate's efforts to exhaust were sufficient under the circumstances[.]" *Napier*, 636 F.3d at 224.  In making this determination, courts consider whether a reasonable jury could conclude that defendants' actions and/or statements "would deter a person of ordinary firmness from continuing with the grievance process." *Himmelreich v. Fed. Bureau of Prisons*, 766 F.3d 576, 578 (6th Cir. 2014).

In the case presently before the Court, plaintiff's claims against defendants are subject to the grievance procedure because they relate to a condition of confinement. *See* O.A.C. § 5120-9-31(A).  The uncontroverted evidence establishes that plaintiff did not timely appeal the denial of any of his four informal complaints, including the December 29, 2011 informal complaint that addressed defendant Fleagle's alleged threats.  More specifically, the applicable rules required plaintiff to file a notification of grievance with the institutional inspector within fourteen days of the denial of any informal complaint.  O.A.C. § 5120-9-31(K)(2).  The present record establishes that plaintiff did not file a notification of grievance as to his informal complaint regarding the alleged threats.  *See Free Declaration*, ¶¶ 8-9.  The record also establishes that plaintiff did not file an informal complaint regarding the December 31, 2011 incident.  *Plaintiff Affidavit*, ¶¶ 49-50, 52, 56.  *Cf. Free Declaration*, ¶ 9.

Plaintiff, however, contends that he was afraid to file any more informal complaints against defendants Fleagle, Brown or Branham after the December 31, 2011 incident. *Plaintiff Affidavit*, ¶¶ 49-50, 52, 56. Instead, plaintiff sent an "intentionally vague" kite to the State Highway Patrol on January 3, 2012. *Plaintiff Affidavit*, ¶¶ 50-53. *See also* Plaintiff's Kite. Defendants counter that plaintiff was not required to file an additional informal complaint; however, complete exhaustion would have required him to pursue the second and third steps of the three-part grievance process. *Reply*, p. 3. Defendants also argue that the record undermines plaintiff's assertions of fear. *Id*. at 4-8.

Defendants' arguments are not well-taken. As set forth above, plaintiff avers that defendant Fleagle threatened plaintiff with bodily harm on December 28, 2011 should plaintiff file more complaints. *Plaintiff Affidavit*, ¶¶ 14-15. After plaintiff filed an informal complaint the following day, he avers that defendants Fleagle and Brown assaulted him in his cell on December 31, 2011. *Id*. at ¶¶ 16, 37-43. These defendants' "retaliation and intimidation — if proven true — would render the grievance process functionally unavailable for a person of ordinary firmness." *Himmelreich*, 766 F.3d at 578. Under these circumstances, plaintiff, who had previously received instructions regarding the prison grievance process, submitted the kite on January 3, 2012 to the Ohio State Highway Patrol. *Plaintiff Affidavit*, ¶¶ 50-52. The Court concludes that there remains a genuine issue of fact as to whether the grievance process was, under the circumstances alleged by plaintiff, available

to him.

Defendants' assertion that plaintiff's filing of an informal complaint against defendant Adams on January 5, 2012 does not militate a different result.  Although the *Complaint*, ¶ 25, alleges that this defendant assisted defendants Fleagle and Brown in the December 31, 2011 incident, plaintiff avers that "[a]t the time I filed the informal complaint on January 5th, I was unaware Adams was responsible for opening the door to my cell and was involved in the assault.  I only learned of this information after I submitted the informal complaint."  *Plaintiff Affidavit*, ¶ 55.  Construing this evidence in a light most favorable to plaintiff, the Court cannot say that the filing of the January 5 complaint against defendant Adams undermines plaintiff's alleged fear of retaliation for pursuing his administrative remedies.

Finally, the facts that plaintiff met with a "non-involved and unbiased Ohio Highway Patrol Trooper" on January 6, 2012 or that defendants dispute the extent of plaintiff's injuries resulting from the December 31, 2012 incident, *Reply*, pp. 4-6, do not unequivocally establish that plaintiff's allegations of fear are disingenuous.  Instead, this evidence simply establishes a genuine issue of fact that must await resolution at trial.[1]

**WHEREUPON**, it is **RECOMMENDED** that the *First Motion for Summary Judgment of Defendants and the State of Ohio on Behalf of Norman Fleagle*, ECF 28, be **DENIED**.

---

[1] To the extent that defendants argue that, because "Plaintiff has failed to satisfy statutory mandates, he has not, nor can he, defeat Defendants' entitlement to qualified immunity[,]" *Motion for Summary Judgment*, p. 5, that argument is not well-taken for the reasons discussed *supra*.

If any party seeks review by the District Judge of this *Report and Recommendation*, that party may, within fourteen (14) days, file and serve on all parties objections to the *Report and Recommendation*, specifically designating this *Report and Recommendation*, and the part thereof in question, as well as the basis for objection thereto.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Response to objections must be filed within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to *de novo* review by the District Judge and of the right to appeal the decision of the District Court adopting the *Report and Recommendation*. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Smith v. Detroit Fed'n of Teachers, Local 231 etc.*, 829 F.2d 1370 (6th Cir. 1987); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


March 30, 2015                         *s/Norah McCann King*
                                    Norah McCann King
                             United States Magistrate Judge




16